UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 0:23-cv-61354

PROGRESSIVE EXPRESS INSURANCE COMPANY,

    Plaintiff,

vs.

RASIER-DC, LLC, a foreign limited liability company; UBER TECHNOLOGIES, INC., a foreign corporation; and KARINA MONASTERIO, individually,

    Defendants.

_____/

**PROGRESSIVE'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

    On July 1, 2017, Florida's Transportation Network Company Statute, Fla. Stat. § 627.748 (the "TNC Statute"), went into effect. Fla. Stat. § 627.748. When the Florida Legislature enacted the TNC Statute, it could have, but did not, expressly declare that UM/UIM Coverage could not be reduced, disclaimed, or rejected. It could have, but did not, mandate that insurers provide uninsured/under insured motorist coverage ("UM/UIM Coverage") or provide such coverage in a particular amount. But, again, it did not.

    Admittedly, the Florida Legislature did not ignore UM/UIM Coverage in the TNC Statute. Rather, the Florida Legislature expressly contemplated such coverage, and addressed the UM/UIM Coverage issue by formally referencing and incorporating Florida's existing uninsured/under insured motorist statute – Fla. Stat. § 627.727 (the "UM/UIM Statute") – and the accompanying body of law surrounding it. *See* Fla. Stat. § 627.748(7)(b)(1.)(c.) and Fla. Stat. §

627.748(7)(c)(1.)(c.).[1] Section 627.727, as reflected both in its statutory language and subsequent decisions interpreting it, expressly authorizes UM/UIM Coverage to be reduced or eliminated entirely. That is what occurred here.

On March 1, 2022, Progressive Express Insurance Company ("Progressive"), issued a "Transportation Network Commercial Auto Policy," to Rasier-DC, LLC ("Rasier"). Uber Technologies, Inc., was a named insured under the policy. Prior to issuing that policy, the named insureds were offered provided with the option to procure, but rejected, UM/UIM Coverage on a valid UM/UIM Selection Rejection Form. The practical effect was simple – there was no coverage under the policy. But, that has not stopped the Defendant, Karina Monasterio ("Monasterio"), from claiming to be entitled to such benefits under that policy.

On May 6, 2022, Monasterio logged into Uber application, accepted a ride, and was transporting an individual when she was involved in an accident. As a result of the accident, Monasterio claims she was injured and has sought benefits under the policy, claiming, wrongly, that Florida's TNC Statute mandates that Progressive provide $1 Million in UM/UIM benefits despite the fact that such coverage was rejected.

Ultimately, this case, generally, and this Motion, specifically, hinges on resolving a discrete legal question – can a Florida TNC reject UM/UIM Coverage. The answer to that question is an unequivocal <u>Yes</u>. The statutory language, the reference to and incorporation of Fla. Stat. § 627.727, and the existing precedent surrounding Fla. Stat. § 627.727 dictate that result. Once resolved, only one factual question remains – was such coverage appropriately rejected. Here, the facts and record are not in dispute, UM/UIM coverage was rejected in the statutorily proscribed manner and, therefore, Progressive is entitled to the entry of declaratory judgment in its favor in connection with its "Amended Complaint for Declaratory Judgment," [DE 12] and against Monasterio in connection with her "Counterclaim/Cross-Claim." [DE 22].

---

[1] Florida's TNC Statute distinguishes between whether an individual is or is not engaged in a 'prearranged ride." *See* Fla. Stat § 627.748. Sections 627.748(7)(b) and (c), involve those two situations. For purposes of this Motion, and given the facts involved in the underlying incident, only Fla. Stat. § 627.748(7)(c) is involved.

CASE NO.: 0:23-cv-61354

## BACKGROUND[2]

**A.   FLORIDA'S TNC AND UM/UIM STATUTES[3]**

**1.   Florida's TNC Statute – Fla. Stat. § 627.748**

Florida's TNC Statute went into effect on July 1, 2022. Fla. Stat. § 627.748. The TNC Statute contains separate insurance requirements depending upon whether a 'prearranged ride,'[4] is involved. *See* Fla. Stat. § 627.748(7)(b) and (c). As it is undisputed that this matter involves a "prearranged ride," the operative insurance requirements are set forth in 627.748(7)(c) which provides, in pertinent part, as follows:

> (c)   The following automobile insurance requirements apply while a TNC driver is engaged in a prearranged ride:
> 1.   Automobile insurance that provides:
>   a.   A primary automobile liability coverage of at least $1 million for death, bodily injury, and property damage;
>   b.   Personal injury protection benefits that meet the minimum coverage amounts required of a limousine under ss. 627.730-627.7405; and
>   c.   <u>Uninsured and underinsured vehicle coverage as required by s. 627.727</u>.
> 2.   The coverage requirements of this paragraph may be satisfied by any of the following:
>   a.   Automobile insurance maintained by the TNC driver or the TNC vehicle owner;
>   b.   Automobile insurance maintained by the TNC; or
>   c.   A combination of sub-subparagraphs a. and b.

Fla. Stat. § 627.748(7)(c)(emphasis added).

The TNC statute does not mandate UM/UIM Coverage in any amount, let alone $1 Million of UM/UIM Coverage. Rather, it mandates $1 Million for separate liability coverage involving

---

[2] Progressive has contemporaneously filed "Progressive's Statement of Material Facts," as required by Rule 56.1 of the Local Rules for the United States District Court for the Southern District of Florida. Citations in the form "(Progressive SOF, ¶ _)" refer to the paragraph number contained in "Progressive's Statement of Material Facts."

[3] The statutory language of the TNC Statute and the UM/UIM Statute are necessary for context. As these are legal matters, not 'facts,' in the traditional sense, the statutory cites have been provided and there is not a separate reference to them in the Progressive SOF.

[4] The term "prearranged ride," is statutorily defined as "the provision of transportation by a TNC driver to a rider, beginning when a TNC driver accepts a ride requested by a rider through a digital network controlled by a transportation network company, continuing while the TNC driver transports the rider, and ending when the last rider exits from and is no longer occupying the TNC vehicle. The term does not include a taxicab or street hail service and does not include ridesharing as defined in s. 341.031, carpool as defined in s. 450.28, or any other type of service in which the driver receives a fee that does not exceed the driver's cost to provide the ride." Fla. Stat. § 627.748(1)(b).

death, bodily injury, and property damage. Fla. Stat. § 627.748(7)(c)(1.)(a.) The TNC Statute is silent concerning the <u>amount</u> (if any) of UM/UIM Coverage required, providing only that UM/UIM Coverage must be provided "<u>as required by s. 627.727</u>." Fla. Stat. § 627.478(7)(c)(1.)(c.) (emphasis added). But, § 627.727 does not mandate any coverage.

    2.    **<u>Florida's UM/UIM Statute – Fla. Stat. § 627.727</u>**

The UM/UIM Statute, § 627.727 sets forth Florida's UM/UIM coverage requirements, generally, as well as the requirements incorporated into Florida's TNC statute, specifically. At the outset, it is significant to note that the statutory requirements differ depending upon whether a specifically insured motor vehicle is involved. *See* Fla. Stat. § 627.727(2).[5] With respect to the specifically insured motor vehicles, the requirement to maintain UM/UIM Coverage is set forth at § 627.727(1). That provides, in pertinent part, as follows:

> No motor vehicle liability insurance policy which provides bodily injury liability coverage shall be delivered or issued for delivery in this state with respect to any specifically insured or identified motor vehicle registered or principally garaged in this state unless uninsured motor vehicle coverage is provided therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom.

Fla. Stat. § 627.727(1). But, § 627.727 does not mandate that any person or entity actually maintain UM/UIM Coverage. Rather, § 627.727(1) expressly states that UM/UIM Coverage can be reduced or eliminated, providing that "[h]owever, the coverage required under this section **is not applicable when, or to the extent that, an insured named in the policy makes a written rejection of the coverage on behalf of all insureds under the policy**." Fla. Stat. § 627.727(1) (emphasis added.).

For policies that do not involve specifically insured motor vehicles, there is no obligation to provide UM/UIM Coverage. Fla. Stat. § 627.727(2). Rather, the applicable statute provides that:

> The limits set forth in this subsection, and the provisions of subsection (1) which require uninsured motorist coverage to be provided in every motor vehicle policy delivered or issued for

---

[5] The statute specifically provides that "The limits set forth in this subsection, and the provisions of subsection (1) which require uninsured motorist coverage to be provided in every motor vehicle policy delivered or issued for delivery in this state, do not apply to any policy which does not provide primary liability insurance that includes coverage for liabilities arising from the maintenance, operation, or use of a specifically insured motor vehicle." Fla. Stat. 627.727(2).

> delivery in this state, do not apply to any policy which does not provide primary liability insurance that includes coverage for liabilities arising from the maintenance, operation, or use of a specifically insured motor vehicle.

Fla. Stat. § 627.727(2). Rather, in that situation, the statute provides that "an insurer issuing such a policy shall make available <u>as a part of the application for such policy, and at the written request of an insured</u>, limits up to the bodily injury liability limits contained in such policy or $1 million, whichever is less." Fla. Stat. § 627.727(2)(emphasis added).

**B.   THE POLICY FORMATION/INCEPTION – THE REJECTION OF UM/UIM COVERAGE**

Defendant, Rasier, operated a Transportation Network Company in Florida. (Progressive SOF, ¶ 1). On March 1, 2022, Progressive issued a "Transportation Network Company Commercial Auto Policy," Policy Number 06250110-8 (the "Period 2-3 Policy"), to Defendant, Rasier as a named insured. (Progressive SOF, ¶ 2). Uber was an additional insured under the Period 2-3 Policy. (Progressive SOF, ¶ 3).

**1.   The Relevant Policy Terms and Provisions**

The limits of <u>liability coverage</u> under the Period 2-3 Policy are $1,000,000 combined single limit. (Progressive SOF, ¶ 4). Admittedly, the Period 2-3 Policy references UM/UIM Coverage, providing, in pertinent part, as follows:

> **PART III—UNINSURED MOTORIST**
>
> **INSURING AGREEMENT—UNINSURED MOTORIST BODILY INJURY COVERAGE**
>
> Subject to the Limits of Liability, if **you** pay the premium for this coverage, **we** will pay damages, other than punitive or exemplary damages, that an **insured** is legally entitled to recover from the **owner** or operator of an **uninsured auto** because of **bodily injury**:
>
> 1.   sustained by an **insured**;
>
> 2.   caused by an **accident** occurring while the **TNC driver** is engaged in providing a **prearranged service**; and
>
> 3.   arising out of the ownership, maintenance, or use of an **uninsured auto**.

(Progressive SOF, ¶ 5). But, as addressed, below, such insuring language was never triggered.

The Period 2-3 Policy defines the term "accident," in pertinent part, as "a sudden, unexpected and unintended event that causes **bodily injury** or **property damage**." (Progressive SOF, ¶ 6)(emphasis in original). The term "insured auto," is defined, in pertinent part, as "any **auto** while being used by a **TNC driver**, but only while engaged in providing a **prearranged service** utilizing the **ride-share application** accessed using that **TNC driver's valid credentials**;…" (Progressive SOF, ¶ 7)(emphasis in original).

A "prearranged service," is defined, in pertinent part, as follows:

> a. the operation of any **insured auto** while the driver is logged on to the **ride-share application** and has recorded acceptance in the **ride-share application** of a request to provide **covered TNC operations** and is engaged in one of the following activities:
> (i) traveling to the accepted pick-up location of the passenger(s) or **goods** to be delivered, including the picking up of any passenger(s) or **goods**, and the pick-up location is in the state of Florida; or
> (ii) traveling to the final destination location of the passenger(s) or **goods**, including the dropping off of any passenger(s) or **goods**, and the pick-up location was in the state of Florida;.

(Progressive SOF, ¶ 8).

The Period 2-3 Policy also contained an additional definition for the term "insured," concerning Part III coverage, expanding it, as follows:

> **ADDITIONAL DEFINITIONS USED IN THIS PART ONLY**
> When used in this Part III, whether in the singular, plural, or possessive:
> 1. "**Insured**" means:
> a. **You;**
> b. Any **TNC driver** operating an **insured auto** who has entered into a contract with **you** to provide **covered TNC operations** via the **ride-share application** and whose contract was in force at the time of the subject **accident** or **loss**; and
> c. Any person while **occupying** and **insured auto** who is using the **valid credentials** of any other person at the time of the subject **accident** or **loss** is not an "**insured**" for purposes of this Part III.

(Progressive SOF, ¶ 9).

6

2. **The Relevant Actions Prior to Policy Inception**

Although the Period 2-3 Policy contained references to UM/UIM Coverage, such coverage never became part of the Period 2-3 Policy. Such coverages were not provided because Rasier, the named insured, did not pay the required premium for UM/UIM Coverage as required under the Period 2-3 Policy. (Progressive SOF, ¶ 10). Such premiums were never paid because, on January 1, 2022, two (2) months before the Period 2-3 Policy's effective date, Amy Wagner, the insured's Head of North American Insurance, executed a "Florida Rejection or Selection of Uninsured Motorist Coverage and Stacked or Non-Stacked Limits," form (the "UM/UIM Selection Rejection Form"). (Progressive SOF, ¶ 11).

The UM/UIM Selection Rejection Form provided, in pertinent part, as follows:

> **FLORIDA REJECTION OR SELECTION OF UNINSURED MOTORIST COVERAGE AND STACKED OR NON-STACKED LIMITS**
>
> **YOU ARE ELECTING NOT TO PURCHASE CERTAIN VALUABLE COVERAGE WHICH PROTECTS YOU AND YOUR FAMILY OR YOU ARE PURCHASING UNINSURED MOTORIST LIMITS LESS THAN YOUR BODILY INJURY LIABILITY LIMITS WHEN YOU SIGN THIS FORM. PLEASE READ CAREFULLY.**
>
> **Description of coverage**
> Uninsured Motorist Coverage provides for payment of certain benefits for damages caused by owners or operators of uninsured motor vehicles because of bodily injury or death resulting therefrom. Such benefits may include payments for certain medical expenses, lost wages, and pain and suffering, subject to limitations and conditions contained in the policy. For the purpose of this coverage, an uninsured motor vehicle may include a motor vehicle as to which the bodily injury limits are less than your damages.
>
> Florida law requires that automobile liability policies include Uninsured Motorist Coverage limits equal to the Bodily Injury Liability limits in your policy up to $1,000,000 combined single limit unless you select a lower limit offered by the company, or reject Uninsured Motorist Coverage entirely. If you are interested in selecting Uninsured Motorist Coverage for a limit less than your Bodily Injury Liability limits, or are rejecting this coverage entirely, you must complete and sign the appropriate option below.
>
> Please indicate whether you desire to entirely reject Uninsured Motorist Coverage, or whether you desire this coverage at limits equal to or lower than the Bodily Injury Liability limits of your policy:
>
> ☒ I reject all Uninsured Motorist Coverage.
>
> ☐ I want Uninsured Motorist Coverage in the same limits as my Bodily Injury Liability Coverage or $1,000,000 combined single limit, whichever is less.
>
> ☐ I want Uninsured Motorist Coverage at the limit selected below.
> ☐ $10,000 each person/$20,000 each accident
> ☐ $100,000 each accident
> ☐ $1,000,000 combined single limit

(Progressive SOF, ¶ 12). As the applicant, Rasier, acknowledged, $1 Million in UM/UIM Coverage was specifically offered, made available, and rejected by it. (Progressive SOF, ¶ 13). Furthermore, Rasier specifically admitted that it had, on behalf of all insureds, executed the UM/UIM Selection/Rejection Form to reject all such coverages. (Progressive SOF, ¶ 14).

Finally, and as reflected on the Commercial Auto Insurance Coverage Summary (the "Declarations Page"), for the Period 2-3 Policy, the Declarations page specifically reflects that UM/UIM Coverage was rejected. (Progressive SOF, ¶ 15). The Declarations Page provides, in pertinent part, as follows:

**Outline of coverage**

| Description | Limits | Deductible |
|---|---|---|
| **Liability To Others** | | |
| Bodily Injury and Property Damage Liability | $1,000,000 combined single limit | |
| Comprehensive | Actual Cash Value | $2,500* |
| Collision | Actual Cash Value | $2,500* |

*$1,000 deductible will apply only if the insured auto was rented or leased from a vendor recognized and authorized by the named insured for specific TNC use.

| | | |
|---|---|---|
| Uninsured Motorist Non-Stacked | Rejected | |

(Progressive SOF, ¶ 16). As reflected in the Period 2-3's Declaration Page, the Limits of Liability for UM/UIM Coverage was and is zero because the coverage was rejected. (Progressive SOF, ¶ 17).

C.   **MONASTERIO'S EXECUTION OF AGREEMENTS AKNOWLEDGING NO UM/UIM COVERAGE**

The Defendant, Monasterio, downloaded the Uber App to operate as a TNC driver in January or February, 2022. (Progressive SOF, ¶ 18). As part of that process to operate as a TNC driver, she was required to acknowledge and sign off on agreements before operating. (Progressive SOF, ¶ 19). Those agreements specifically included the "Platform Access Agreement." (Progressive SOF, ¶ 20). The Platform Access Agreement that Monasterio signed and executed specifically provided that:

> 3.5   **Uber Maintained Insurance**. We may, in our sole discretion, choose to maintain auto insurance related to your Rides, but we are not required to provide you with any specific coverage for loss to you or your vehicle, <u>unless we specifically describe it in an addendum to this PAA</u>. <u>We can change, reduce or cancel insurance that is maintained by us, if any, at any time without notice to you or authorization from you or authorization from you</u>.

(Progressive SOF, ¶ 21)(emphasis added).

Monasterio acknowledged that 'addendum to the PAA' addressed available insurance coverage to her in Florida. (Progressive SOF, ¶ 22). The operative 'addendum to the PAA,' as acknowledged by Monasterio, provided, in pertinent part, as follows:

> Beginning when a User request for transportation has been accepted within the Uber application and ending when the last requesting User departs from your vehicle, a trip is ended, or a trip is cancelled, whichever is later, Company maintains primary automobile liability

>insurance in the amount of $1,000,000 for death, bodily injury and property damage. In addition, during this period Company maintains Medical Payments coverage in the amount of $5,000 per insured. If a driver holds Comprehensive and Collision coverage on his/her personal auto policy, then Company also maintains coverage for physical damage to the vehicle with a $2,500 deductible.

(Progressive SOF, ¶ 23). As Monasterio has acknowledged, neither the Platform Access Agreement, nor the operative addendum, mention or suggest that UM/UIM Coverage would be provided. (Progressive SOF, ¶ 24).

Ultimately, Monasterio contends that, at some point, she looked at the Uber App and saw a "Certificate of Insurance." (Progressive SOF, ¶ 25). That document, the Certificate of Insurance, disclosed the coverage that was available – liability coverage – but it did not contain the words "uninsured/underinsured motorist" anywhere. (Progressive SOF, ¶ 26).

## D.     THE MAY 6, 2022 INCIDENT AND SUBSEQUENT COVERAGE DISPUTE

On May 6, 2022, Defendant, Monasterio, owned and was driving a 2022 Honda Accord, Vehicle Identification No. 1HGCV1F35LA129244 (the "Honda"). (Progressive SOF, ¶ 27). The Honda was not specifically identified in the Period 2-3 Policy by make, model, or Vehicle Identification number, anything to suggest that it was or would be a 'specifically insured motor vehicle.' (Progressive SOF, ¶ 28). At that time, Monasterio, logged into the "Uber" ride share application and accepted a request on the Uber App to provide a ride for a passenger, Bradford Cavanaugh. (Progressive SOF, ¶ 29). At some point prior to 10:45 a.m., Monasterio, picked up Cavanaugh at the Hollywood-Fort Lauderdale Airport. (Progressive SOF, ¶ 30). During this pre-arranged ride, Monasterio, was driving the Honda when another individual, Michael Israel, lost control of his vehicle, spun through three lanes of traffic, and collided with Monasterio's vehicle. (Progressive SOF, ¶ 31). As a result of this incident, Defendant, Monasterio, contends that she has sustained significant bodily injuries. (Progressive SOF, ¶ 32).

On August 17, 2022, Monasterio, filed a lawsuit in the Seventeenth Judicial Circuit in and for Broward County, Florida, Case No. CACE-22-012164 (the "Lawsuit"), in connection with the May 6, 2022. (Progressive SOF, ¶ 33). In the Complaint, Defendant, Monasterio, asserted claims against Progressive in which she contended that she is entitled to receive UM/UIM benefits pursuant to the Period 2-3 Policy. (Progressive SOF, ¶ 34). In particular, Monasterio alleged that the incident occurred while she was engaged in a "prearranged ride;" with and individual who was

under insured, and for which Progressive was obligated to provide UM/UIM Coverage under the Period 2-3 Policy. (Progressive SOF, ¶ 35).

In the wake of that filing, Progressive filed the present action seeking a declaration (albeit set forth in multiple counts) that there was no UM/UIM Coverage under the Period 2-3 Policy. (Progressive SOF, ¶ 36). In response, Uber and Rasier essentially conceded what Progressive knew – there was no such coverage. (Progressive SOF, ¶ 37). But, Monasterio opposed the requested declaration, contending that: (i) Progressive had 'unclean hands,' and was somehow estopped or precluded from denying that there is UM/UIM Coverage under the Period 2-3 Policy; (ii) denying the material allegations of the Declaratory Judgment Action; and (iii) filing a Counter Claim essentially arguing the opposite (i.e., that the TNC Statute preclude reducing or waiving UM/UIM Coverage). (Progressive SOF, ¶ 38). But, that filing does not change the facts, the law, or create a question that somehow would preclude the entry of final summary judgment in Progressive's favor with respect both its Declaratory Judgment Action <u>and</u> the Counterclaim.

## ARGUMENT

Resolving this Motion requires the Court to resolve two questions: (i) whether the TNC Statute and its express reference and incorporation of the UM/UIM Statute allows the insured TNC to reject, and insurers not provide, UM/UIM Coverage consistent with the UM/UIM State; and (ii) whether such a reduction or rejection was appropriately made. Based upon existing precedent and the undisputed facts, both questions must be answered in the affirmative and summary judgment is entirely appropriate in favor of Progressive.

**A.  SUMMARY JUDGMENT STANDARD**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986); *Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1225 (11th Cir. 1999). Thus, the task is to determine whether, considering the evidence in the light most favorable to the non-moving party, there is evidence on which a trier of fact could reasonably find a verdict in its favor. *See Hilburn*, 171 F.3d at 1225; *Allen v. Tyson*

*Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Here there is no such evidence and Progressive is entitled to judgment as a matter of law.

B. **FLORIDA'S TNC STATUTE DOES NOT MANDATE PROGRESSIVE PROVIDE $1 MILLION UM/UIM COVERAGE – RATHER, THE STATUTE EXPRESSLY REFERENCE FLORIDA'S UM/UIM STATUTE, A STATUTE THAT ALLOWS FOR SUCH COVERAGES TO BE REJECTED**

1. **The Express Statutory Language Contains No Requirement that UM/UIM Coverage be Provided Or Afforded**

The only party that contends that the Period 2-3 Policy must provide coverage, is Monasterio. But, this position is predicated upon a flawed premise, that Florida law, specifically the TNC Statute, mandated that Progressive provide such coverage. [*See* DE 22, Counterclaim, ¶ 15]. But, such a position cannot be reconciled with either the statutory language or existing principles of statutory interpretation. Florida's legislature, in enacting §627.748, could have, but did not, specify the amount of UM/UIM insurance required. It included specific amounts for other types of insurance. See Fla. Stat. §627.748(7)(c)(1)(a.) (mandating "liability coverage of at least $1 million for death, bodily injury, and property damage."). Section 627.748(c), only imposes an obligation to obtain uninsured and underinsured motorist coverage "as required by s. 627.727." Fla. Stat. §627.727(7)(c). Similarly, it could have expressly articulated that coverage could not be reduced, rejected, or eliminated. Again, it did not, providing only that uninsured and underinsured motorist coverage was to be provided "as required by s. 627.727. Fla. Stat. §627.727(7)(c). Put simply, the purported 'legislative intent,' underlying Monasterio's conclusion cannot be discerned from the statutory language.

Ultimately, Florida applies the 'plain meaning rule,' of statutory construction. *See All Family Clinic of Daytona Beach, Inc. v. State Farm Mut. Auto. Ins., Co.*, 685 F.Supp.2d 1297, 1231 (S.D. Fla. 2010)(Ungaro, J.); *citing State v,. Dugan*, 685 So. 2d 1210, 1212 (Fla. 1996). "Where the language of a statute is clear and unambiguous, there is no room for interpretation." *All Family Clinic of Daytona Beach, Inc. v. State Farm Mut. Auto. Ins. Co.*, 685 F.Supp.2d 1297, 1301 (S.D. Fla. 2010). Here, the TNC Statute specifically provides that UM/UIM Coverage is to be provided "as required by s. 627.727." Fla. Stat. §627.748(7)(c). The TNC Statute's express reference to uninsured and underinsured motorist coverage "as required by s. 627.727," reflects the clear intent that the requirements of section 627.727 would control whether, and how much, uninsured or underinsured coverage would be provided.

11

The statutory provisions cited by Monasterio in the Counterclaim do not support some different application of the 'plain meaning rule.' [*See* DE 22, p. 10, ¶ 23]. Section 627.748(7)(c) only imposes an obligation to obtain uninsured and underinsured motorist coverage "as required by s. 627.727." Fla. Stat. §627.748(7)(c). Furthermore, §627.748(7)(d), mandates only that the "TNC must provide the coverage required <u>under this subsection</u>." All that is required under the sub-section is coverage required by §627.727; coverage which, pursuant to statute, <u>can be rejected</u>. As discussed below, §627.727 allows a party to reject such coverage.

> **2.** **Florida's UM/UIM Statute and Subsequent Florida Decisions Recognize that UM/UIM Coverage Can be Reduced or Rejected – Therefor the Assertion that UM/UIM Coverage Cannot Be Rejected is Untenable**

Florida's UM/UIM statute distinguishes between policies that provide coverage for specifically identified automobiles from other policies. *See* Fla. Stat. §627.727(1), (2); *Nieves v. N. River Ins. Co.*, 49 So. 3d 810 (Fla. 4th DCA 2010); *Zurich Am. Ins. Co. v. Cernogorsky*, 211 So. 3d 1119 (Fla. 3d DCA 2017). Section 627.727(1) provides, in pertinent part, as follows:

> No motor vehicle liability insurance policy which provides bodily injury liability coverage shall be delivered or issued for delivery in this state with respect to any specifically insured or identified motor vehicle registered or principally garaged in this state unless uninsured motor vehicle coverage is provided therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom.

Fla. Stat. §627.727(1). Importantly, §627.727 does not mandate that any person or entity maintain UM/UIM insurance. In particular, §627.727 expressly states that UM/UIM coverage can be reduced or eliminated, providing that "[h]owever, the coverage required under this section is not applicable when, or to the extent that, an insured named in the policy makes a written rejection of the coverage on behalf of all insureds under the policy." Fla. Stat. §627.727(1) (emphasis added). Florida's UM/UIM statute literally provides that UM/UIM coverage, even for specifically identifiable and insured vehicles, is not required – it can be rejected. *See Brown-Peterkin v. Williamson*, 307 So. 2d 45 (Fla. 4th DCA 2020) (acknowledging the ability, under the statute, to reject or obtain lower UM/UIM limits); *Geico Indem. Co. v. Perez*, 260 So. 3d 342 (Fla. 3rd DCA 2018).

Equally important, however, is the distinction made at sub-paragraph two (2) which provides that the requirements to obtain even a written rejection are inapplicable to situations in which a specifically identified vehicle is not involved. Section 627.727(2) provides, in pertinent part, as follows:

> The <u>limits set forth in this subsection</u>, and <u>the provisions of subsection (1) which require uninsured motorist coverage to be provided in every motor vehicle policy</u> delivered or issued for delivery in this state, <u>do not apply to any policy which does not provide primary liability insurance</u> that includes coverage for liabilities arising from the maintenance, operation, or use <u>of a specifically insured motor vehicle</u>.

Fla. Stat. 627.727(2)(emphasis added).

Pursuant to Section 627.727(2), where the vehicle is not 'specifically insured or identified,' in the Policy, the requirements of 627.727(2), not 627.727(1), control. *See Hooper v. Zurich Ins. Co.*, 789 So. 2d 368 (Fla. 2d DCA 2001). Rather, all that is required is that the applicant be notified of the availability of UM/UIM coverage. *See* Fla. Stat. §627.727(2); *Weesner v. United Servs. Auto. Ass'n*, 711 So. 2d 1192, 1193 (Fla. 5th DCA 1998); *citing Tres v. Royal Surplus Lines Ins. Co.*, 705 So. 2d 643 (Fla. 3d DCA 1998).

\*   \*   \*

By implementing the TNC statute, a statute that expressly incorporated §627.727, the Florida legislature is presumed to know the existing law concerning §627.727, including the ability to reject UM/UIM coverage. *Potter v. Potter*, 317 So. 3d 255, 258 (Fla. 1st DCA 2021). It cannot, therefore, be seriously contended that the legislature passed a law, one which referenced and expressly incorporated another (one that expressly authorized rejections, reductions, or wholesale waivers of UM/UIM coverage), but did not intend for those provisions to apply. As such, there is simply one conclusion – the TNC Statute does not mandate, and UM/UIM Coverage can be rejected.

C.   **PURSUANT TO EXISTING PRECEDENT, UM/UIM COVERAGE WAS VALIDLY AND APPROPRIATELY REJECTED BY THE INSURED**

Having resolved the statutory question – whether coverage can be rejected, only one issue remains – resolving whether coverage was, in fact, appropriately rejected here. Resolving that question, fortunately, is easy because as there are no disputed factual questions and the coverage was appropriately rejected under either § 627.727(1) or (2).

1.  **UM/UIM Coverage Was Offered and Declined in Compliance with Fla. Stat. § 627.727(2)**

As an initial matter, the Period 2-3 Policy neither identifies nor covers "a specifically insured motor vehicle." The Policy did and does not identify a specific vehicle nor is the 2022 Honda specifically identified. (Progressive SOF, ¶ 26). Rather, the Period 2-3 Policy applied, if at all, to incidents involving "insured autos." The term "insured auto," is not limited to a specific vehicle identified in a dec page or the policy. Rather, it is defined as any vehicle being used by a transportation network company driver. (Progressive SOF, ¶ 7). Stated differently, the Period 2-3 Policy does not cover a specifically identified vehicle; it covers an activity. Coverage is afforded for potentially any (or no) vehicle, depending upon whether particular services are being provided, not whether a specific vehicle is involved. (Progressive SOF, ¶ 7).

Pursuant to Section 627.727(2), where the vehicle is not 'specifically insured or identified,' in the Policy, the requirements of 627.727(2), not 627.727(1), control. *See Hooper v. Zurich Ins. Co.*, 789 So. 2d 368 (Fla. 2d DCA 2001). Rather, all that is required is that the applicant be notified of the availability of UM/UIM coverage. *See* Fla. Stat. §627.727(2); *Weesner v. United Servs. Auto. Ass'n*, 711 So. 2d 1192, 1193 (Fla. 5th DCA 1998); *citing Tres v. Royal Surplus Lines Ins. Co.*, 705 So. 2d 643 (Fla. 3d DCA 1998). Here, although more traditionally evaluated in the context of Fla. Stat 627.727(1), the UM/UIM Selection Rejection Form, was specifically provided to the applicant. It reflects, and the applicant/Defendant, Rasier, concedes, that $1 Million in UM/UIM coverage, the amount required by statute, was specifically offered, made available, and rejected by the applicant, Rasier. (Progressive SOF, ¶ 13). As such, there is a valid rejection under Fla. Stat. 627.727(2).

2.  **Alternatively, to the Extent that this Court Believes that a Specifically Insured Auto Was Involved – the Requirements of § 627.727(1) Were Satisfied**

In the event that there is some suggestion, which Progressive would dispute, that the Period 2-3 Policy somehow concerns a specifically identifiable auto despite the fact that no make, model, vehicle identification number, etc., is identified anywhere within the policy, or that the Honda qualifies as such a specifically insured vehicle, that does not change the result where, as here, Progressive obtained a written express rejection of UM/UIM Coverage as required by §627.727(1). Section 627.727 expressly states that UM/UIM coverage can be reduced or eliminated, providing that "[h]owever, the coverage required under this section **is not applicable when, or to the extent**

**that, an insured named in the policy makes a written rejection of the coverage on behalf of all insureds under the policy**." Fla. Stat. §627.727(1) (emphasis added). Florida's UM/UIM statute literally provides that UM/UIM coverage is not required – it can be rejected. See *Brown-Peterkin v. Williamson*, 307 So. 2d 45 (Fla. 4th DCA 2020) (acknowledging the ability, under the statute, to reject or obtain lower UM/UIM limits); *Geico Indem. Co. v. Perez*, 260 So. 3d 342 (Fla. 3rd DCA 2018).

Here, the applicant has expressly acknowledged making a written rejection of UM/UIM Coverage on behalf of all insureds. (Progressive SOF, ¶ 14). There is no dispute that the statutory burden has been satisfied.

D. **AS COVERAGE WAS APPROPRIATELY AND VALIDLY REJECTED – THERE IS NO LEGAL BASIS UPON WHICH TO CONCLUDE THAT PROGRESSIVE IS OBLIGATED TO AFFORD UM/UIM COVERAGE OR BENEFITS AND PROGRESSIVE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW**

Where the is no underlying coverage, there is no corresponding duty to provide indemnity benefits. *See State Farm Mut. Auto. Ins. Co. v. Lampilia*, 2023 U.S. Dist. LEXIS 1167987 (S.D. Fla. Aug. 28, 2023)(Dudek, Mag. J.). Where, as here, the coverage Monasterio contends exists, does not, one must discern whether there is any other basis upon which one may conclude that coverage may exist. The problem is – there is none. Although Monasterio has suggested that coverage may be afforded because of '[Progressive] misled her into believe (sic.) that Progressive offered UM/UIM insurance coverage through Progressive's statements…" [DE 22, p. 5], such a position lacks legal or factual merit.

As an initial matter, Florida generally does not recognize coverage by estoppel and, by extension, this 'unclean hands,' theory to impose a coverage obligation here. *See Gotham Ins. Co. W. Coast Fire Prot. Corp.*, 752 Fed. Appx. 793, 798 (11th Cir. 2018). The narrow exception to the general rule provides that it would operate where "to do so would require sanction fraud or other injustice." *Gotham Ins.*, 752 Fed. Appx. at 798; *citing AIU Ins. v. Block Marina Inv., Inc.*, 544 So. 2d 998, 1000 (Fla. 1989). But, in order to establish such a position, Monasterio was required to, but cannot, establish that Progressive made a representation as to a material fact that is contrary to a later-asserted position, (2) reliance on that representation, and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon." *Id.*; *citing Tome v. State Farm Fire & Cas. Co.*, 125 So. 3d 864, 867 (Fla. Dist. Ct. App. 2013) (internal quotation marks omitted). But no such showing can be made here.

First, there is no change in position or misrepresentation by Progressive to Monasterio; Progressive has consistently maintained that there is no UM/UIM Coverage under the Period 2-3 Policy. In addition, it never misrepresented anything to Monasterio. As reflected in the TNC statute, the TNC (not the insurer), is required to disclose "the insurance coverage, including types of coverage and the limits for each coverage, which the TNC provides while the TNC driver uses a TNC vehicle in connection with the TNC's digital network." Fla. Stat. §627.748(8)(a)(1). By statute, the TNC had a duty to disclose what coverages were available; **not what coverages were rejected**. Here, that duty was satisfied by providing the accessible Certificate of Insurance indicated that there was: (i) $1 million of bodily injury and property damage coverage (combined single limit); (ii) comprehensive collision coverage; and (iii) medical payments coverage.

Second, even what Monasterio contends is the purported misrepresentation, is not actionable. Monasterio alleged that Progressive has unclean hands and is therefore precluded from denying coverage because of a purported failure to disclose "that Uber/Rasier attempted to waive UM/UIM insurance coverage." [DE 22, p. 5]. As an initial matter – there is simply no duty to disclose what coverages were rejected. *See* Fla. Stat. § 768.748(a). In addition, such an assertion cannot be reconciled with the undisputed record – Monasterio received and signed the Platform Access Agreement in which she advised that the insurance available would be described in the 'addendum.' Monasterio acknowledged and admitted that the there was never a representation by Progressive or anyone that there was UM/UIM Coverage – neither the PAA, the addendum, nor the Certificate of insurance she claims to have seen even mentioned UM/UIM Coverage. (Progressive SOF, ¶¶ 22-26). Neither Monasterio nor anyone else can establish coverage by ignoring the very agreements she signed and acknowledged. *Oter-Ramos v. Serv. Fin. Co., LLC*, 202 U.S. Dist. LEXIS 76952 (S.D. Fla. May 1, 2020)(Smith, J.) (recognizing that a party to a contract is conclusively presumed to known and understand the contents, terms, and conditions of the contract).

The fact is that Progressive never made any representations to Monasterio concerning UM/UIM coverage and was under no obligation to notify her of the rejection of such coverage. As such, there is no misrepresentation and the estoppel/unclean hands theory raised by Monasterio as an affirmative defense is inapplicable.

## **CONCLUSION**

The Florida Legislature, when it adopted the TNC Statute, could have, but did not, impose a new, separate, or different obligation upon insurers to provide UM/UIM Coverage. Rather, it implemented a statutory scheme that was consistent with and expressly adopted the UM/UIM Statute and its existing framework and precedent, one which expressly acknowledges that such coverage can be rejected.

Here, Rasier, the named insured, rejected such coverage. As a result, Progressive cannot and should not be required to provide coverage for something that is not mandated, that was rejected, and that its insured never contracted for. There is no factual or legal question precluding judgment, and Progressive would request that this Court grant its motion, and enter judgment in its favor, and against the Defendants with respect to its Declaratory Judgment Action, and similarly enter judgment in its favor and against Monasterio in connection with her Counterclaim, and enter a declaration consistent with the relief sought in Progressive's Amended Complaint for Declaratory Judgment and the present Motion for Summary Judgment.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

CASE NO.: 0:23-cv-61354

Dated: January 25, 2024					Respectfully submitted,

					/s/ Patrick K. Dahl
					**Patrick K. Dahl, Esquire (084109)**
					pdahl@morganakins.com
					Florida Bar No. 084109
					**MORGAN & AKINS, PLLC**
					*Attorneys for Progressive Express Insurance Company*
					501 E. Las Olas Boulevard
					Suite 300
					Ft. Lauderdale, FL 33301
					Phone: (754) 255-3010
					Fax: (215) 600-1303

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system on January 25, 2024, and the foregoing document is being served this day on all counsel or parties of record on the Service List below, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

					/s/ Patrick K Dahl
					Patrick K. Dahl, Esquire