UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 0:23-cv-61354

PROGRESSIVE EXPRESS INSURANCE COMPANY,

    Plaintiff,

vs.

RASIER-DC, LLC, a foreign limited liability company; UBER TECHNOLOGIES, INC., a foreign corporation; and KARINA MONASTERIO, individually,

    Defendants.
_____/

### KARINA MONASTERIO'S RESPONSE TO PROGRESSIVE'S MOTION FOR SUMMARY JUDGMENT

COMES NOW KARINA MONASTERIO, by and through her undersigned attorneys, and files one omnibus response to Progressive's Motion for Summary Judgment, and Uber/Rasier's Joinder of Motion for Summary Judgment, and states:

### INTRODUCTION

A negligent driver crashed into Monasterio's vehicle while Monasterio was driving for Uber and transporting a passenger in her car. Monasterio was paralyzed in the crash, and the negligent driver did not have sufficient insurance coverage to pay for the damages he caused. Fortunately, Florida statutes section 627.748(7)(c) (1.) (c.) required Uber, Rasier, and Progressive, to maintain a policy of uninsured/underinsured motorist coverage ("UM/UIM") for the Plaintiff's benefit. However, Uber, Rasier, and their insurer, Progressive have refused to pay the benefits required by law.

1

This is a case of first impression for the Court.  The words in section 627.748 (the "TNC Statute") must have meaning.  That law, enacted in 2017, lists the "insurance requirements" that a transportation network company ("TNC") like Uber must maintain while a driver is engaged in a prearranged ride. One of those insurance requirements is UM/UIM vehicle coverage.  Florida statutes section 627.727(2) dictates that the limits of UM/UIM be "not less than the limits of bodily injury coverage" unless the insured makes a lower selection.  Here, Rasier-DC, LLC never made a lower selection, and therefore, there should be $1,000,000 of UM/UIM coverage available to indemnify Monasterio for her injuries.

Progressive's Motion asks the Court to ignore the words found in the statute.  It asks the Court to conclude that those words have no meaning, and impose no "insurance requirements" upon Progressive, Uber, or Rasier.  That interpretation would lead to an absurd result, leave thousands of drivers on Florida's roads without adequate insurance, and frustrate the plain meaning of the law and the intention of the Florida Legislature.  Progressive's Motion for Summary Judgment must be denied.

## BACKGROUND

I. **Florida Enacts Section 627.748 to Regulate Transportation Network Companies.**

In 2017, the Florida Legislature enacted section 627.748 (the "TNC Act")  of the Florida Statutes to regulate Transportation Network Companies ("TNC") in the state, with the effect that TNCs be regulated by "uniform laws governing TNCs, TNC drivers, and TNC vehicles throughout the state." Fla. Stat. §627.748 (17)(a). The TNC Act contains 18 separate subparagraphs which regulate a wide array of TNC issues, such as: employment status of TNC drivers (subparagraph 9), designating an agent within the state for a TNC to accept service of process (subparagraph 3),

and requiring TNCs to display a photograph of the driver and license plate of the TNC vehicle before a rider enters a TNC driver's vehicle (subparagraph 5). The statute defines certain terms.[1]

This case involves the requirements of subparagraphs 7 and 8. Subparagraph 7 begins:

> (a) Beginning on July 1, 2017, a TNC driver or a TNC on behalf of the TNC driver shall maintain primary automobile insurance that:
> 1. Recognizes that the TNC driver is a TNC driver or otherwise uses a vehicle to transport riders for compensation; and
> 2. Covers the TNC driver while the TNC driver is logged on to the digital network of the TNC or while the TNC driver is engaged in a prearranged ride.

It is undisputed that at the time of this incident, Monasterio was engaged in a prearranged ride, therefore Fla. Stat. 627.748(7)(c) applies:

> (c) The following automobile insurance requirements apply while a TNC driver is engaged in a prearranged ride:
>
> a. Automobile insurance that provides:
>   i. A primary automobile liability coverage of at least $1 million for death, bodily injury, and property damage;
>   ii. Personal injury protection benefits that meet the minimum coverage amounts required of a limousine under ss. 627.730-627.7405; and
>   iii. Uninsured and underinsured vehicle coverage as required by s. 627.727.
>
> b. The coverage requirements of this paragraph may be satisfied by any of the following:

---

[1] TNC, TNC driver, TNC vehicle, and Prearranged ride are each statutory defined term.
  "TNC" means a Transportation Network Company who uses a digital network to connect riders to TNC driver, who provide prearranged ride for compensation. Fla. Stat. §627.748(1)(e)
  "TNC driver" means an individual who, in return for compensation, uses a uses a TNC vehicle to offer or provide prearranged rides. Fla. Stat. §627.748(1)(g)
  "TNC vehicle" means a vehicle that is not a taxicab or a jitney that is used by a TNC driver to offer or provide a prearranged ride and is owned, leased, or otherwise authorized to be used by a TNC driver. Fla. Stat. §627.748(1)(h)
"Prearranged ride" means provision of transportation by a TNC driver to a rider beginning when the TNC driver accepts the ride request, continuing while the driver transports the rider, and ending when the last rider exits from and is no longer occupying the TNC vehicle. Fla. Stat. §627.748(1)(b)

3

> i. Automobile insurance maintained by the TNC driver or the TNC vehicle owner;
> ii. Automobile insurance maintained by the TNC; or
> iii. A combination of sub-subparagraphs a. and b.

The law goes on to explain:

> (d) If the TNC driver's insurance under paragraph (b) or (c) has lapsed or does not provide the required coverage, the insurance maintained by the TNC **must** provide the coverage required under this subsection, beginning with the first dollar of a claim, and have a duty to defend such claim.

In subparagraph 8, the law requires that TNCs disclose, in writing, to their TNC drivers "[t]he insurance coverage, including the types of coverage and limits for each coverage, which the TNC provides while the TNC driver uses a TNC vehicle in connection with the TNC's digital network." Fla. Stat. §627.748(8)(A) (1.).

To quell any doubt about the insurance requirements under the TNC Act, the Florida Legislature issued a "House of Representative's Final Bill Analysis" on May 11, 2017, after the law had passed both chambers of the legislature and had been signed by the governor. Transportation Network Companies Act of 2017, Fla. H.B. 221, Fla S.B. 340 "House of Representatives Final Bill Analysis" (May 11, 2017).[2] The TNC Act was approved by the Florida House of Representatives on April 5, 2017, approved by the Florida Senate on April 19, 2017, and signed by the Governor on May 9, 2017. In this analysis, they state that the TNC Act provides a regulatory framework for TNCs with "minimum insurance requirements for TNCs and TNC drivers." The analysis explains it was the intention of the Florida Legislature that:

> "When a TNC driver is engaged in a prearranged ride, the automobile insurance must provide:

---

[2] For convenience, Monasterio attaches the Transportation Network Companies Act of 2017, Fla. H.B. 221, Fla S.B. 340 "House of Representatives Final Bill Analysis" (2017) as an exhibit to this Response.

4

- Primary automobile liability coverage of at least $1 million for death, bodily injury, and property damage.
- Personal injury protection benefits that meet the minimum coverage amounts required of a limousine under the Florida Motor Vehicle No-Fault Law. Pursuant to s. 627.733(1)(a), F.S., limousines are exempt from the Florida Motor Vehicle No-Fault Law. However, if the Legislature removes this exemption or makes certain parts of the Florida Motor Vehicle No-Fault Law applicable to limousines, the changes in that law would also apply to TNCs and their drivers.
- Uninsured and underinsured vehicle coverage."

*Id*. at p. 5. This analysis clarifies that the Legislature intended TNCs and their drivers to have uninsured/underinsured motorist coverage in place when TNC drivers are engaged in a prearranged ride.

### II. The Collision Underpinning this Litigation

On May 6, 2022 Monasterio logged onto the Uber mobile application and accepted a prearranged ride to transport a passenger, Bradford Cavanaugh, from the Hollywood-Fort Lauderdale Airport to Miami. Around 10:45 AM, Monasterio was engaged in this prearranged ride on the Uber App and traveling southbound in the I-95 express lane when another vehicle lost control, spun over three lanes of traffic, crossed the barrier of the express lane, and slammed into Monasterio's car. As a result of this collision, Monasterio, who is 34 years old, is no longer able to walk because of severe injuries to her spine. The negligent driver, Michael Israel, did not have sufficient insurance to cover the damages he caused in the collision. Consequently, Monasterio sought to recover UM benefits that she understood were in place by Uber.

When Monasterio first began driving for Uber, she checked the insurance coverage provided to her by the company. The information Monasterio viewed on Uber's website stated that Uber provided UM/UIM coverage for its drivers with "coverage varying by state." Uber's website did not disclose that it had allegedly rejected UM/UIM coverage in Florida. Documents

posted online by Uber and Progressive do not disclose that Uber attempted to reject UM/UIM coverage in Florida.

### III. Progressive's Transportation Network Company Insurance Policy

In March of 2022, Progressive issued a "Transportation Network Company Commercial Auto Policy" to Rasier-DC, LLC, policy No. 06250110-8 (the "2-3 Policy"). Uber is listed as an additional insured. Rasier-DC, LLC is a wholly owned subsidiary of Uber Technologies, Inc. In this case, there is no dispute that the collision that injured Monasterio was an "accident" as defined by the 2-3 Policy. There is likewise no question that the 2-3 Policy applies to Monasterio, as she was engaged in a prearranged ride for Uber at the time of the collision. The term "insured auto" in the 2-3 Policy is defined as "any auto while being used by a TNC driver, but only while engaged in providing a prearranged service utilizing the ride-share application accessed using that TNC driver's valid credentials…"

The 2-3 Policy does not insure any specifically identified motor vehicle, any specifically identified people, or any specifically identified companies. Rather, in addition to the named and additional insured, it provides coverage broadly to:

> Any TNC driver operating an insured auto who has entered into a contract with [Uber] to provide covered TNC operations via the ride-share application and whose contract was in force at the time of the subject accident or loss. . .

**MEMORANDUM OF LAW**

  **I.**  **The text of Florida statutes section 627.748 requires that Defendants provide uninsured/underinsured motorists coverage for the Plaintiff.**

  In 2017, the Florida Legislature enacted section 627.748 of the Florida statutes to regulate the insurance requirements for Transportation Network Companies ("TNC") in the state, with the effect that TNCs be regulated by "uniform laws governing TNCs, TNC drivers, and TNC vehicles throughout the state." *Checker Cab Operators, Inc. v. Miami-Dade County*, 899 F.3d 908 (11th Cir. 2018) (quoting Fla. Stat. §627.748(17)(a)). TNCs revolutionized the transportation industry by potentially turning each and every automobile on the road into a vehicle for hire. At any moment, just about any driver, in any car, can download the Uber app and ferry a passenger from point a to point b. A central issue to this case is whether Uber, Rasier, and Progressive can ignore the plain text of section 627.748 and leave this mass of TNC drivers without mandated insurance coverage.

  The text of the law squarely addresses the inseparable insurance issues created by TNCs. Subparagraph seven is titled "Transportation Network Company and TNC Driver Insurance Requirements." It begins, fundamentally changing the insurance marketplace in Florida, by requiring that "a TNC driver, or a TNC on behalf of the TNC driver shall maintain primary automobile insurance that: 1. Recognizes that the TNC driver is a TNC driver. . . and 2. Covers the TNC driver while the TNC driver is logged on to the digital network of the TNC or. . . is engaged in a prearranged ride." Sub subsections (b) and (c) detail the "automobile insurance requirements that apply" while a TNC driver is logged onto the Uber application or engaged in a prearranged ride, respectively. Fla. Stat. §627.748(7)(b) and (c).

  Here, Ms. Monasterio was engaged in a prearranged ride and therefore the following "insurance requirements apply":

> 1. Automobile insurance that provides:
>     a. a primary automobile liability coverage of at least $1 million for death, bodily injury, and property damage;
>     b. Personal injury protection benefits that meet the minimum coverage amounts provided of a limousine under ss. 627.730-627.7405; and
>     c. Uninsured and underinsured motorist coverage as required by s. 627.748.

Fla. Stat. §627.748(7)(c)(1.)(a.)-(c.). The coverages described above may be satisfied by: (1) insurance maintained by the TNC driver or vehicle owner; (2) by the TNC itself; or (3) by any combination of the first two. Fla. Stat. §627.748(7)(c)(2.). However, if the TNC driver's personal insurance "has lapsed or does not provide the required coverage, the insurance maintained by the TNC **must** provide the coverage required under this subsection, beginning with the first dollar of a claim. . ." Fla. Stat. §627.748(7)(d).

The text of the TNC Act leads to only one conclusion- the insurance requirements at the time of Ms. Monasterio's injury included UM/UIM. Progressive argues that the phrase "required by s. 627.727" modifies the plain language of the statute to allow a TNC to freely able to reject UM/UIM on behalf of all TNC drivers. Well established cannons of statutory interpretation require this Court to reject that argument.

First, "a statute must be given its plain and obvious meaning." *Fla. Dept. of Environmental Protection v. ContractPoint Florida Parks, LLC*, 986 So.2d 1260, 1265 (Fla. 2008). "Every statute must be read as a whole with meaning ascribed to every portion and due regard given to the semantic and contextual interrelationship between its parts." *Id*. (internal citations omitted). "A statute should be interpreted to give effect to every clause in it, and to accord meaning and harmony to all of its parts. . ." *Id*.

The plain meaning of the phrase "insurance requirements" is that the listed coverages, including UM/UIM are required. The law requires an TNC and its insurer to pay those claims

8

"beginning with the first dollar." Fla. Stat. §627.748(7)(d). Thus, the requirement to obtain UM/UIM coverage is controlled by the TNC Act.

Contrary to Progressive's assertion, the phrase "as required by s.627.727" does not allow Rasier to reject, or Progressive to fail to provide UM/UIM insurance coverage. When one statute specifically refers to the another, the two should be read *in pari materia*. *United Petro/Energy Corp. v. U.S.*, 846 F.Supp. 993, 997 (S.D. Fla. 1994). Courts must construe statutes on the same subject harmoniously, and, if possible, give effect to every provision in both. SINGER, NORMAN AND SINGER, J.D. SHAMBIE, STATUTES AND STATUTORY CONSTRUCTION, §51.2 (2012). "Where one statute deals with a subject in general terms and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible." *Id*. at §51.5. Generally, the words in a statute should be given their ordinary meaning, and when this ordinary meaning produces a "contextual harmonization," such meaning will control. SUMMERS, ROBERT, STATUTORY INTERPRETATION IN THE UNITED STATES, Interpreting Statutes, 434-441 (1991). Statutory texts must be construed "reasonably, to contain all that it fairly means," recognizing, "[in] textual interpretation, context is everything." ANTONIN SCALIA, COMMON LAW COURTS IN A CIVIL LAW SYSTEM: THE ROLE OF UNITED STATES FEDERAL COURTS IN INTERPRETING THE CONSTITUTION AND LAWS, IN A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW, 23 (Amy Gutmann ed., 1997).

The phrase "as required by s.627.727" refers to and invokes the entire section of Florida statues that regulates UM/UIM insurance. This section provides a detailed regulation of UM/UIM coverage, and informs the TNC Act, as a whole, that aside from the specific "insurance requirement" found only in the TNC Act, other provisions of §627.727 apply. For example, Subsection (2) addresses the applicable limits of insurance, and requires limits in an amount equal

9

to the bodily injury liability insurance as a default; Subsection (3) defines UM/UIM coverage and describes its applicability; Subsections (4) and (5) relate to insolvent insurers; Subsection (6) explains the process of settling with an uninsured or underinsured motorist and injured parties duties to keep the UM/UIM insurer apprised of the settlement. *See generally* Fla. Stat. §627.727.

Therefore, to read the two statutes together, harmoniously, it is logical to conclude that the TNC Act mandates UM/UIM coverage as an "insurance requirement" and by referencing section 627.727, the legislature invoked the law that relates to UM/UIM coverage generally.

Progressive myopically focuses on the rejection language in subsection (1), however that rejection language does not apply here. Subsection (1) only applies to policies of insurance "issued for delivery in this state **with respect to any specifically insured or identified motor vehicle** registered or principally garaged in this state." Fla. Stat. §627.727(1). Written rejections of UM/UIM coverage, therefore, are only effective, under Florida law, for policies "issued for delivery in this state **with respect to any specifically insured or identified motor vehicle**." *Id*. No other subsection of §627.727 limits its applicability to specifically insured or identified motor vehicles. For instance, Subsection (9), which relates to stacking of UM/UIM benefits, states "Insurers may offer policies of uninsured motorist coverage containing policy provisions. . ." without limiting the subsections applicability to specifically insured or identified motor vehicles. Fla. Stat. §627.727(9)(a)-(e).

The 2-3 Policy is not issued for specifically insured or identified vehicles. Rather, Progressive's "Florida Transportation Network Company Commercial Auto Policy" provides coverage to "any auto while being used by a TNC driver, but only while engaged in providing a prearranged service utilizing the ride-share application accessed using that TNC driver's valid credentials…" See Policy, General Definitions (7.)(a.), p. 3. This definition of "insured auto" is

far from a specifically insured or identified vehicle. If no one in Florida is using their car as a TNC driver to provide a prearranged ride, then this policy does not insure a single vehicle. Conversely, if every single Florida resident were to be engaged in a prearranged ride for Uber at once, this policy would cover every car in Florida. Potentially, the policy can cover any combination of autos in the state.

Progressive asks the Court to accept that, because subsection (1) of §627.727 is the only subsection of the UM/UIM law where insurers are required to include UM/UIM absent a written rejection, and that because the 2-3 Policy does not insure a specific motor vehicle, therefore insurers of TNCs have no obligation to ever offer UM/UIM. This interpretation flies in the face of the plain language of Fla. Stat. §627.748(7)(c)(2.) and §627.748(7)(d). If the effect of the TNC Act which requires TNC to provide certain insurance requirements beginning with the first dollar, is that those requirements are meaningless, then why write that subsection into the statute at all?

Progressive's argument highlights a potential ambiguity in the law. The legislature did not specify the limits of UM/UIM that are mandated by the TNC Act. When a statute is "susceptible to more than one reasonable interpretation," it is ambiguous. *Kelly v. Sabretech, Inc.*, 106 F. Supp.2d 1283, 1287 (S.D. Fla. 1999) (quoting *Breedlove v. Earthgrains Baking Companies, Inc.*, 140 F.3d 797 (8th Cir. 1998). Here, if the Court concludes that both Monasterio and Progressive's interpretations are reasonable, then the Court should look to the intent of the Florida Legislature when passing the TNC Act.

The Florida Legislature's intent is memorialized in the Transportation Network Companies Act of 2017, Fla. H.B. 221, Fla S.B. 340 "House of Representatives Final Bill Analysis." That analysis is telling in what it includes, and what it omits. It states:

> "When a TNC driver is engaged in a prearranged ride, the automobile insurance must provide:

- Primary automobile liability coverage of at least $1 million for death, bodily injury, and property damage.
- Personal injury protection benefits that meet the minimum coverage amounts required of a limousine under the Florida Motor Vehicle No-Fault Law. Pursuant to s. 627.733(1)(a), F.S., limousines are exempt from the Florida Motor Vehicle No-Fault Law. However, if the Legislature removes this exemption or makes certain parts of the Florida Motor Vehicle No-Fault Law applicable to limousines, the changes in that law would also apply to TNCs and their drivers.
- Uninsured and underinsured vehicle coverage."

Id. p. 5. The second bullet point readily concedes that the personal injury protection section is tied to the limousine requirements, and that although limousines are current exempt from personal injury protection coverage, any future change in the law would automatically apply to TNC drivers. There is no such discussion about UM/UIM coverage. To the contrary, footnote 17 confirms that UM/UIM coverage is "required by s. 627.727." The third bullet point plainly states that UM/UIM vehicle coverage is an "insurance requirement" under the TNC Act.

Progressive's interpretation of the TNC Act is contrary to both the plain language of the TNC Act and its legislative intent. The cases cited by Progressive are well known in traditional UM/UIM disputes, but none of them address the TNC Act's independent requirement that TNCs provide UM/UIM coverage to their drivers. See *Zurich Am. Ins. Co. v. Cernogorsky*, 211 So.3d 1119 9Fla. 3d DCA 2017) (confirming that there is no need for a written waiver when procuring an excess policy); *Nieves v. North River Ins. Co.*, 49 So.3d 810 (Fla. 4th DCA 2011) (holding the requirement to make UM/UIM coverage available in an excess policy is satisfied when that policy includes the coverage, at no extra cost, if the underlying policy also provides UM/UIM); *Hooper v. Zurich Ins. Co.*, 789 So.2d 368 (Fla. 2d DCA 2001) (establishing that when an employer provides wide coverage to an unspecified number of vehicles in an insurance policy, there is no requirement that UM/UIM be specifically rejected because such policy does not issue to a

"specifically identified motor vehicle."); *Wesner v. United Servs. Auto. Ass'n*, 711 So.2d 1192 (Fla. 5th DCA 1998) (holding that no written rejection is necessary for an umbrella policy).

Using the well-established cannons of statutory interpretation, section 627.748, the specific statute about insurance requirements for TNC drivers, must be read harmoniously with section 627.727, the general statute about UM/UIM insurance. Thus, the phrase "as required by s.627.727" must mean a general reference to all of the regulations relating to UM/UIM coverage. The requirement that TNCs provide insurance for their drivers, and that such insurance contain UM/UIM coverage is borne by the plain text of section 627.748, and that requirement is not somehow abridged by language in §627.727(1) relating to "specifically insured or identified motor vehicles" or voided because other subsections of §627.727 don't expressly require Um/UIM from TNCs. The plain text of §627.748 contains an independent requirement for UM/UIM coverage. This independent requirement is not subject to a written rejection. Therefore, Defendant's motion must be denied on this issue.

## II. Even if This Court Concludes that UM/UIM Coverage May Be Rejected, No Valid Rejection Exists Here.

Progressive's argues that UM/UIM coverage was appropriately rejected. That is not so. Only the "named insured" may reject coverage for all named and additional insured. *Whitten v. Progressive Cas. Ins. Co.*, 410 So.2d 501 (Fla. 1982) (abrogated on a separate issue by *Florida Patient's Compensation Fund v. Rowe*, 472 So.2d 1145 (Fla. 1985)). Moreover, the rejection must be on a form approved by the OIR.

First, Amy Wagner is not the representative of Rasier-DC, LLC- but rather of its parent company Uber Technologies, Inc. This distinction is important because Rasier-DC, LLC is the named insured and Uber Technologies, Inc. is merely an additional insured, depriving Uber Technologies of the ability to reject UM/UIM coverage for all insureds under the policy. Therefore,

the rejection form relied on by Progressive only applies to Uber Technologies, and does not reject Um/UIM for all insureds.

Additionally, here there is no evidence that Florida's OIR approved the rejection form used by Progressive in conjunction with the 2-3 Policy. The language in the form makes this inapplicability clear. The rejection form refers to rejection of coverage for "You and your family," it refers to "our spouse or any family member." It is clear that this form does not fit with the wide ranging 2-3 Policy, which may potentially insure every vehicle in Florida if the entire population engaged in a prearranged ride concurrently.

### III. Progressive's Arguments Will Lead to an Absurd Result.

The TNC Act became law in 2017, because Uber revolutionized the taxi industry, often by entering a market before receiving government approval. When UBER first began operating in Florida, it did so illegally. Carlos Ibarcena, *Going Under the Hood: The Winners and Losers of Florida's Transportation Network Companies Law*, 42 NOVALR 45, 47 (Fall 2017). Part of UBER's business model included gaining a competitive advantage over traditional transportation companies by eschewing compliance with regulatory requirements. *Id*. As some local municipalities enacted regulations to permit TNCs, other local governments in Florida flatly refused to permit TNCs at all. *Id*. at 48. Under this hodgepodge of local laws, insurance issues arose due to gaps in coverage on personal auto policies, inadequate insurance amounts, and fraud by TNC drivers who omitted their status on accident reports. *Id*. at 52. By enacting section 627.748, the legislature sought to regulate this activity completely, balancing the needs of TNCs with the increased risk they create.

Progressive, Uber, and Rasier seek to continue these early practices now. The TNC Act regulates a wide aspect of TNC conduct, giving TNCs important legal protections such as: limiting

the TNC's liability, declaring TNC drivers independent contractors (and therefore ineligible to receive workers' compensation benefits), and allowing a TNC driver's own auto policy to exclude coverage when they are engaged in a prearranged ride. It is that last provision that leads to an absurd result if the Court adopts Progressives' view of the law. Section 627.748(8)(b)1. Allows:

(b)1.   An insurer that provides an automobile liability insurance policy under this part may exclude any and all coverage afforded under the policy issued to an owner or operator of a TNC vehicle while driving that vehicle for any loss or injury that occurs while a TNC driver is logged on to a digital network or while a TNC driver provides a prearranged ride. Exclusions imposed under this subsection are limited to coverage while a TNC driver is logged on to a digital network or while a TNC driver provides a prearranged ride. This right to exclude all coverage may apply to any coverage included in an automobile insurance policy, including, but not limited to:
  a.   Liability coverage for bodily injury and property damage;
  b.   Uninsured and underinsured motorist coverage;
  c.   Medical payments coverage;
  d.   Comprehensive physical damage coverage;
  e.   Collision physical damage coverage; and
  f.   Personal injury protection.

Therefore, non-TNC insurers can deny coverage to TNC drivers if they are engaged in a ride for Uber. This leaves Uber's policies, like the 2-3 Policy, as the only source of coverage for thousands of vehicles traveling Florida's roads every day. These drivers perform services for Uber, and accept significant limitations in their abilities to assert rights afforded to them in a traditional employment context. In exchange, the TNC must simply provide required coverages while they are on the road.

This give and take is logical. TNCs place thousands of amateur drivers on the roadways to act as their service providers. The service provides access to travel, food, and the workplace for many who need a ride. However, there are also increased risks. Public roads see an increased risk of car traffic, sudden stops to pick up and drop off passengers by drivers who are not trained as taxis or limousines, partially disabled drivers who use TNCs to supplement income, and drivers

who may not be familiar with the place they are traveling to. It is logical to protect them, and their passengers, from the risks of the roadways while they perform further Uber's business. Because the law allows personal insurance carriers to exclude coverage while engaged in rides, Uber's policy is the single remaining option for insurance protection.

This case is an excellent example of a claimant who needs that protection. Monasterio was injured through no fault of her own, and is became permanently disabled at the age of 34. Allowing the involved corporate parties to creatively interpret the law to lower their own costs leaves Monasterio to the government and to charity as caregivers. In the aggregate, Progressive's position in this suit will cost society millions, as Uber sends drivers into hazardous roadways, and then disavows them when they are injured during serving the company.

Passengers will also be left unprotected from un- or underinsured drivers. The increased risk to passengers is more alarming because, while Uber, Rasier, and Progressive have an obligation to disclose insurance coverages to their drivers, many passengers are altogether oblivious that the multi-billion dollar company they patronize, is hanging them out with no UM/UIM coverage.

It is absurd to think that this result was intended by the legislature when passing the TNC Act. It is absurd to conclude that this law intentionally places the burden to care for persons injured by un- and underinsured motorist during an Uber ride on society rather than on the enterprise creating, promoting, and profiting from this increased risk. Progressive's interpretation of the act, while beneficial to them and their client, leaves thousands of Floridians unprotected and unaware.

## **CONCLUSION**

Progressive seeks to avoid responsibility for failing to provide UM/UIM coverage when it was legally mandated, for misleading Plaintiff about the availability of UM/UIM coverage, and

for violating Florida law. The TNC Act independently requires UM/UIM coverage, and Progressive, Uber, and Rasier have, thus far, refused to provide it. These parties should not be allowed to circumvent Florida law, and leave Florida's residents exposed. For the reasons stated above, Progressive's Motion must be denied.

WHEREFORE, Plaintiff KARINA MONASTERIO, respectfully requests this Court enter an Order denying Progressive's Motion for Summary Judgment, Denying Uber and Rasier's relief sought in adopting Progressive's Motion for Summary Judgment, and any other relief this Court deems just and proper.

## REQUEST FOR HEARING

This case presents issues of first impression in the state of Florida. The Court's ruling here will affect all transportation network company drivers across the state. The case involves the intersection of a developing method of transportation, the states' efforts to regulate that transportation, and Florida's insurance law. Undersigned counsel believes it would be helpful for the Court to explain Monasterio's position orally, addressing any questions that the Court may have regarding the parties' interpretation of the TNC Act or future implications of the Court's ruling. Undersigned counsel estimates that full oral argument on this Motion will take between 45 minutes to 1 hour, however, undersigned counsel appreciates any time that the Court can provide for a hearing and oral argument.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that the foregoing was filed and served with the cm/ecf on this 15th day of February, 2024 to: Patrick K. Dahl, Esq. Morgan & Akins.,501 E. Las Olas Blvd., Suite 300 Fort Lauderdale, FL 33301; pdahl@morganakins.com ; Veresa Jones Adams., ROIG LAWYERS., 1255 S. Military Trail, Suite 100, Deerfield Beach, FL 33442; liabilitypleadings@roiglawyers.com ; vadams@roiglawyers.com ; Martha D. Fornaris, Esq. Fornaris Law Firm, P.A. 65 Almeria Avenue, Coral Gables, FL 33134; mfornaris@fornaris.com

        ROBERTS, P.A.
*Counsel for Plaintiff*
113 Almeria Avenue
Coral Gables, FL 33134
Telephone: 305-442-1700
Fax: 305-442-2559
E-mail: roberts@robertspa.com
basnuevo@robertspa.com

By:    s/: Javier A. Basnuevo
JAVIER A. BASNUEVO
Fla. Bar No.: 100509
H. CLAY ROBERTS
Fla. Bar No.: 262307